UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

LORI A. BROWN                          )
                                       )
V.                                     )            NO. 2:10-CV-149
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security        )

<u>REPORT AND RECOMMENDATION</u>

The matter is before the United States Magistrate Judge, under the standing orders of

the Court and 28 U.S.C. § 636 for a report and recommendation. This is a judicial appeal of

the denial of plaintiff's claim for disability insurance benefits under the Social Security Act.

Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 8

and 14].

The sole function of this Court in making this review is to determine whether the

findings of the Secretary are supported by substantial evidence in the record. *McCormick*

*v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial

evidence" is defined as evidence that a reasonable mind might accept as adequate to support

the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough

to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought

to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607

(1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor

decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even

if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 33 years of age at the time of her administrative hearing before an Administrative Law Judge. She has a high school education. She had past relevant work experience in telemarketing, which varied from sedentary to light exertionally and from semiskilled to skilled. She alleged a disability onset date of February 8, 2006. Although she alleged a number of physical impairments, the only impairments which the ALJ found to be severe were uncontrolled diabetes and a pilonidal cyst.[1]

Plaintiff's medical history is set forth in the Commissioner's brief as follows:

> Plaintiff began treating with Dr. Archer in December 2001 (Tr. 211). At that time, Dr. Archer diagnosed NIDDM (non-insulin dependent diabetes mellitus) and gave her some samples of Glucophage (Tr. 211). At her February 2002 visit, Dr. Archer noted that Plaintiff was responding well to the Glucophage (Tr. 210). Plaintiff continued to see Dr. Archer for her diabetes, as well as a variety of ailments, including sebaceous cysts, obesity, pilonidal cysts, tobacco abuse, cellulitis of the neck, dysphagia, furunculosis, allergic rhinitis, GERD (gastroesophageal reflux disease), pregnancy, low back pain, bilateral leg pain, hyperlipidemia, peripheral edema, microalbuminuria, myalgias, and hypertension (Tr. 165-210, 332-46, 415-17).

> In January 2005, about one year prior to her alleged onset of disability, Plaintiff was hospitalized (Tr. 362), and Dr. Morris saw her in endocrine consultation for diabetes mellitus, complicated by pregnancy when she was approximately five weeks pregnant (Tr. 218). Dr. Morris noted that Plaintiff had a five-year history of diabetes mellitus and had been on insulin for the past two years, with her most recent insulin regimen consisting of 38 Lantus at bedtime and boluses of NovoLog based on carbohydrate count (Tr. 218). Plaintiff had been seen in Dr. Kappa's office that day and noted to have blood sugars elevated at greater than 400 milligrams per

---

[1]A pilonidal cyst occurs below the tailbone (coccyx) and can, as was the case with plaintiff, become infected and cause great pain.

2

deciliter (Tr. 218). Plaintiff stated that her blood sugar had been running in the 300 and 400 range for the past month, and she also reported that her most recent hemoglobin A1C done just one week prior was 9.7% (Tr. 218).

Since her hospital admission, Plaintiff received more intensive insulin therapy and had responded satisfactorily with her blood sugar dropping below 200 milligrams per deciliter (Tr. 218). Dr. Morris diagnosed diabetes mellitus type uncertain, first trimester pregnancy, and obesity, and noted that Plaintiff seemed to be responding appropriately to more intensive insulin management (Tr. 218). He recommended continued intensive monitoring and insulin therapy and, if Plaintiff continued to a have reasonable response, he suggested consideration of early discharge, possibly on the following day, to continue management on an outpatient basis (Tr. 218). Dr. Morris noted that all options would remain open for management of Plaintiff's diabetes, including possible insulin pump therapy if necessary (Tr. 218). He also recommended that Plaintiff be seen by diabetic teaching service for further diet instruction and general education (Tr. 219).

Plaintiff returned to Dr. Morris in February 2005 (Tr. 302). Upon review of her glucose log, Dr. Morris noted that generally Plaintiff was achieving acceptable glucose control for gestation, with the exception of her fasting blood sugar, which had been mildly elevated in the 90-130 mg/dl range (Tr. 302). He indicated that Plaintiff was experiencing occasional overnight hypoglycemic reactions (Tr. 302). Dr. Morris instructed Plaintiff to check her blood sugar at specific times and adjust insulin accordingly (Tr. 302). He commented that Plaintiff also occasionally experienced some mild hypoglycemic reactions in the midmorning (Tr. 302). Dr. Morris reviewed and discussed some management interventions and advised Plaintiff to check fasting ketones (Tr. 302).

When Plaintiff saw Dr. Archer in June 2006, he noted that her non-insulin dependent diabetes was in poor control, so he referred her to Dr. Beasey for additional help with blood sugar control (Tr. 338). He also noted that Plaintiff had a chronic pilonidal cyst and instructed her to continue using Lortab and taking sitz baths (Tr. 338).

Dr. Konrad performed a consultative evaluation of Plaintiff in September 2006 (Tr. 347- 49). Upon examination, he noted full range of movement all joints and no tenderness, heat, swelling or deformity in any joint (Tr. 348). Plaintiff's neck was supple with full range of motion (Tr. 348). Examination of Plaintiff's back showed no kyphosis, no scoliosis, no scars, normal lumbar flexure, no tenderness, no muscle spasm, full range of motion, and straight leg raising was negative (Tr. 348). Also, Plaintiff was able to rise from chair and get on and off the exam table without problems, and move sitting to lying and back again with no or minimal difficulty (Tr. 348). Plaintiff's grip was full into palm, and dexterity was normal in thumb-finger opposition and in self-dressing (Tr. 348). Her finger-nose coordination and finger tracking was normal, and she had no tremors or involuntary movements (Tr. 348). Plaintiff walked unassisted without a limp, and was able to tandem walk (Tr. 348).

3

Plaintiff's strength was 5/5 (normal) in her upper and lower extremities and grip (Tr. 348). There was no asymmetrical muscle wasting, and she was able to bear weight on each leg separately (Tr. 348). Plaintiff was able to walk on her toes and heels (Tr. 348). Her reflexes were -1 (somewhat diminished, low normal, with reinforcement) and symmetrical (Tr. 348).

Plaintiff's vision acuity was grossly normal in finger tracking and general movements (Tr. 348). Sensation was intact throughout to pinprick, vibration, and light touch (Tr. 348). There was no sensory radiculopathy and no peripheral neuropathy (Tr. 348). Dr. Konrad diagnosed diabetes, obesity and tachycardia and concluded that, based on the objective findings of his examination, Plaintiff had no impairment-related physical limitations (Tr. 349).[2]

Dr. Beasey saw Plaintiff in endocrine consultation in September 2006 (Tr. 380-81). After interview and examination, he diagnosed diabetes mellitus Type II (Tr. 381). They talked about insulin pump therapy, which Dr. Beasey thought was the best idea for her (Tr. 381). He planned to check Plaintiff's lab work and make changes on her insulin accordingly, and then move forward with the pump (Tr. 381). Dr. Beasey also diagnosed morbid obesity, tobacco abuse (and encouraged her to quit smoking), high cholesterol (on medication), proteinuria, multinodular goiter, and evidence of androgen overproduction (Tr. 381).

Dr. Downey, a state agency physician, reviewed the record evidence in October 2006 and concluded that Plaintiff did not have a severe impairment (Tr. 350-53).

In November 2006, Dr. Archer completed a "Physical Capacities Evaluation" form and checkmarked a box indicating that Plaintiff could not perform all the functions of sedentary work and had the ability for less than an full range of sedentary work (Tr. 418).

When he saw Plaintiff in January 2007, Dr. Archer indicated that Plaintiff had gotten an insulin pump and was going to diabetic training on how to use the pump that day (Tr. 336).

Plaintiff presented to the emergency room in February 2007, reported significant fluctuations in her blood sugars for the previous week since being placed on insulin, some episodes of blurry vision over the previous three days, swelling in the lower extremities, and headache (Tr. 334). Various laboratory testing and diagnostic testing were performed (Tr. 334- 35). Dr. Chumbley diagnosed ethmoid sinusitis and questioned whether Plaintiff's symptomology with blurry vision was secondary to her fluctuating blood sugar levels while she was getting adjusted to her insulin pump (Tr. 335). Plaintiff was discharged home and encouraged to see her family doctor for reevaluation (Tr. 335).

Plaintiff saw Dr. Archer five days after her emergency room visit and noted that her blurry vision was slightly better and her blood sugar was much better (Tr.

---

[2]It must be noted at this point that the ALJ totally rejected Dr. Konrad's conclusion of the plaintiff having no severe impairments, a decision with which this Court totally agrees.

333).

        Dr. Warner, a state agency physician, reviewed the record evidence in March 2007 and concluded Plaintiff could perform a range of medium exertional work (Tr. 354-61).

        In July 2007, Plaintiff was hospitalized due to poorly controlled diabetes (Tr. 406-13). She had planned on having same-day surgery for a pilonidal cyst, but her blood sugar was in the 400s, so Plaintiff needed to have her diabetes under better control before she had the surgery because, with uncontrolled diabetes, surgical wounds were notoriously difficult to heal (Tr. 406). Dr. Dimitrov noted that Plaintiff had been on an insulin pump until two weeks prior to the planned surgery, but there was some malfunctioning of the insulin pump and for the previous two weeks, Plaintiff was on Novolog 40 units twice per day (Tr. 408). Plaintiff was started on insulin and her blood sugar stayed mostly in the upper 100s and around 200, and she eventually had the surgery to excise the pilonidal cyst (Tr. 406, 409, 411-12).

        In December 2007, Dr. Archer again completed a "Physical Capacities Evaluation" form and checkmarked a box indicating that Plaintiff could not perform all the functions of sedentary work and had the ability for less than an full range of sedentary work (Tr. 414).

[Doc. 15, pgs. 2-7].

At the administrative hearing, the ALJ called Dr. Susan Bland as a medical expert.

Dr. Bland's testimony is set forth in the defendant's brief as follows:

        Dr. Bland reviewed the record evidence and testified as a medical expert at the January 2008 hearing. She stated that medical records first mentioned diabetes in December 2001, and that Plaintiff also had a problem with cysts (Tr. 35). Dr. Bland discussed Plaintiff's diabetes and her fluctuating A1C levels, and her use of the insulin pump (Tr. 36-39). Dr. Bland concluded that Plaintiff was able to perform light duty, or light exertional, work, except that she should not work alone, around hazardous equipment or machinery or unguarded height, or drive a vehicle (Tr. 39). She also noted that, due to the problems with the pilonidal cysts, prolonged sitting could be a problem, so Plaintiff should be limited to about four hours of sitting and be able to alternate sitting and standing (Tr. 39).

[Doc. 15, pgs. 7-8].

Dr. Bland also mentioned "it's very difficult to tell about [plaintiff's] compliance..." due to some missing pharmacy records. (Tr. 38). This is significant because the ALJ stated in his opinion that "Dr. Bland noted that there was some mention of non-compliance with

diet and exercise in the record."  (Tr. 15).

At the administrative hearing, plaintiff's counsel asked leave of the ALJ at the end of the hearing to ask the plaintiff a question to clear up Dr. Bland's difficulty in evaluating plaintiff's compliance with her treatment regimen.  The ALJ announced that he was "going to assume she's compliant...," that he was "not going to find non-compliance.," and that plaintiff's compliance was "not an issue with me." (Tr. 46).

In his hearing decision, the ALJ found that "after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 12).  In other words, diabetes and a pilonidal cyst *could* produce the symptoms plaintiff alleged, *but* not in her case because she was not being completely truthful.  How did he arrive at this conclusion?  After mentioning Dr. Bland's testimony regarding compliance, the ALJ states "therefore, the claimant's credibility concerning poor control of her diabetes is given little weight *considering she has been non-compliant with her diabetic treatment.*"  (Tr. 15). *Emphasis added.*  The ALJ found that she had the residual functional capacity ["RFC"] to perform light work, but would be precluded from working around dangerous machinery, unprotected heights, or driving a vehicle.  Also she would be limited to sitting for four hours in a work day with some alternating of sitting and standing. (Tr. 11).  Finding that she could perform her past relevant work as a telemarketer with this RFC, he found that she was not disabled.  (Tr. 15 and 16).

Plaintiff argues that the ALJ erred (1) in not giving proper reasons for rejecting the

opinion of her treating physician, Dr. Archer; (2) in not considering the effect of her morbid obesity on her RFC; and (3) in discounting her testimony based upon her "non-compliance" when he foreclosed further examination on that subject at the administrative hearing because he was going to find that she was compliant with her treatment regimen.

Obviously, this is close case in the sense of whether the plaintiff is disabled or not. Her blood sugar numbers speak for themselves. They are not "faked" or contrived. As stated by the ALJ, they *could* produce the plaintiff's symptoms. The only capacity assessments from any physician who ever examined the plaintiff are those of Dr. Archer, since the incredible opinion of Dr. Konrad that she had no impairments was rejected by the ALJ. Although a vocational expert appeared and testified, the only job he identified which the plaintiff could perform if her RFC was that found by the ALJ was her past relevant work.

This entire case hinges upon the ALJ's determination of plaintiff's credibility. The defendant Commissioner asserts that the ALJ's assessment that the plaintiff's credibility was lowered by his conclusion that she was non-compliant with her diabetes treatment regimen was "harmless error." Under the facts of this case however, the Court cannot agree. If there were overwhelming substantial evidence that the plaintiff was not disabled in any event, then the result might well be different. However here, the finding that the plaintiff could engage in substantial gainful activity rests upon the slenderest of threads, that she possessed the residual functional capacity to return to her past relevant work as a telemarketer. Her credibility regarding the effects of her conditions is of paramount importance to the determination of her RFC.

The ALJ, probably with the best of intentions, told plaintiff's counsel at the

administrative hearing that it was not necessary to examine the plaintiff regarding the slight suggestion of noncompliance brought up by Dr. Bland because the ALJ was "going to assume she's compliant" and "I'm not going to find non-compliance...that's not an issue with me." (Tr. 46). In fact, he gave her testimony regarding the effects of her diabetes on her activities "little weight" because of her perceived "non-compliance." (Tr. 15). It was not the only factor upon which his credibility determination was based, but was obviously the *major* factor. The other factors, such as trying to care for her baby and the like, are hardly as damning as assumed prevarication. His reference to her non-compliance in his opinion as a gauge of her lessened credibility was most likely the result of the vast increase in Social Security disability adjudications, to which this Court can well relate. However, the Court cannot say the error here is harmless, and in fact, in this otherwise close case, it taints the entire adjudication. The Commissioner's position under these circumstances is not substantially justified.

Plaintiff asserts that an immediate award of benefits is appropriate. However, the Court disagrees that the evidence is overwhelming, which it must be for a court-ordered finding that a Social Security claimant is disabled. Millions of insulin-dependent diabetics are in the work force, and the removal of the pilonidal cyst could have dramatically approved her ability to sit without interruption.

It is respectfully recommended that the case be remanded to the Commissioner for further evaluation of her residual functional capacity. A more elaborate report from Dr. Archer would certainly be enlightening, as well as the results of any further examinations the Commissioner would care to attain. It is further recommended that the plaintiff's Motion for

Judgment on the pleadings [Doc. 8] be GRANTED to the extent of the recommended remand, and that the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be DENIED.[3]

Respectfully submitted:

_s/ Dennis H. Inman_____
United States Magistrate Judge

---

[3]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).